UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARLENE HURLBURT,

                           Plaintiff,      **No. 6:17-cv-06372-MAT**
                                           **DECISION AND ORDER**

              -vs-

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                           Defendant.
_____

## I.   Introduction

Represented by counsel, Marlene Hurlburt ("Plaintiff")
instituted this action pursuant to Title II of the Social Security
Act ("the Act"), seeking review of the final decision of the Acting
Commissioner of Social Security ("the Commissioner") denying her
application for Disability Insurance Benefits ("DIB"). The Court
has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g),
1383(c).

## II.  Procedural Status

Plaintiff protectively filed for DIB on May 6, 2014, and her
claim was denied initially. At Plaintiff's request, a video-
conference hearing was held on November 12, 2015, before
Administrative Law Judge Rosanne M. Dummer ("the ALJ"). Plaintiff
appeared with her attorney and testified. Vocational expert Jane F.
Beougher ("the VE") also testified.

After the hearing, the ALJ sent interrogatories (T.326-60)[1] to a medical expert, Anne E. Winkler, M.D., Ph.D., a board-certified rheumatologist and internist. Dr. Winkler submitted answers to the ALJ's interrogatories on November 26, 2015 (T.349-60), opining that Plaintiff had the following medically determinable physical impairments: migraine headaches (controlled with medication), rheumatoid arthritis ("RA") (on combination of medications), gastritis, osteopenia, and hypothyroidism. (T.356). In response to specific questions from the ALJ, Dr. Winkler concluded that Plaintiff did have problems with RA from February 2014, to May 2014, but when she restarted her medications, her RA once again became controlled. (T.220, 358). In a medical source statement, Dr. Winkler opined that Plaintiff could perform a range of light work with some postural and environmental limitations. (T.351-53).

The ALJ also sent interrogatories to the VE who had testified at the hearing. In the interrogatories, the ALJ posed a hypothetical of an individual of Plaintiff's age, education, and vocational background, who was limited to light work and could frequently do the following: reach, handle, finger, feel, push, pull, operate foot controls, balance, operate a motor vehicle, and tolerate humidity, wetness, and extreme cold; and could occasionally climb, stoop, kneel, crouch, and crawl. (T.194). The

---

[1] Citations in parentheses to "T." refer to pages in the certified administrative transcript.

VE confirmed that such a person could perform Plaintiff's past relevant work as an assistant branch manager, office manager, and administrative assistant. (T.195). The VE further stated that there were other jobs such a person could perform, citing as representative examples, the jobs of receptionist, information clerk, and credit card clerk. (T.196). The VE indicated that such an individual could also perform unskilled light occupations, such as ticket taker, toll collector, and photocopy machine operator; as well as unskilled sedentary positions, such as document preparer, addresser, and table worker. (T.196-97).

On February 19, 2016, the ALJ issued an unfavorable decision. (T.15-31). Pursuant to the sequential evaluation process applicable to DIB claims, see 20 C.F.R. § 404.1520, the ALJ determined, at step one, that Plaintiff had not engaged in substantial gainful activity between her October 1, 2013, alleged onset date and the date of decision. (T.17). At step two, the ALJ found that Plaintiff had the following severe impairments: RA and headaches. (T.18-19). At step three, the ALJ determined that Plaintiff's impairments did not meet or medically equal a listed impairment. (T.19). The ALJ then assessed Plaintiff as having the residual functional capacity ("RFC") to perform light work[2] with certain non-exertional

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Light work also includes the ability to perform the exertional requirements of sedentary

limitations.[3] (T.19-28). At step four, the ALJ found that Plaintiff could perform her past relevant work as an assistant branch manager and office manager. (T.28-29). At step five, the ALJ made an alternative finding that Plaintiff could perform other work available in significant numbers, relying on the VE's interrogatory responses. (T.29-30). Therefore, the ALJ found that Plaintiff was not under a disability as defined in the Act. (T.31).

The Appeals Council denied Plaintiff's request for review on April 21, 2017, making the ALJ's decision the Commissioner's final decision. Plaintiff then timely commenced this action.

Presently before the Court are the parties' motions for judgment on the pleadings. The Court incorporates by reference herein the factual recitations by Plaintiff and the Commissioner in their respective briefs. For the reasons discussed below, Plaintiff's motion is denied; the Commissioner's motion is granted; and the Commissioner's decision is affirmed.

## III. Scope of Review

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the

---

work. Id.

[3]

The ALJ determined that Plaintiff can frequently reach, handle, finger/feel, and push/pull; frequently operate foot controls; frequently balance; occasionally climb, stoop, kneel, crouch, and crawl; occasionally work around unprotected heights and moving mechanical parts, and; frequently operate a motor vehicle and tolerate humidity/wetness and extreme cold. (T.19).

decision is based on legal error. 42 U.S.C. § 405(g); see also Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). The district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quotation omitted). The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)).

## IV. Discussion

### A. Error in Weighing the Opinions Offered by Treating Sources (Plaintiff's Point I)

Plaintiff argues that the ALJ's assignment of "great weight" to Dr. Winkler's opinion, combined with the ALJ's failure to give "controlling, significant, or more weight" to the opinions offered by primary care physician Dr. Garneau and neurologist Dr. Dunn, are errors requiring remand.

### 1. The Treating Physician Rule

A treating physician's opinion on the issues of the nature and severity of a claimant's impairments is accorded controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). When an ALJ declines to accord a treating physician's opinion controlling weight, she must consider several factors, including the length, nature and extent of the treatment relationship; the frequency of examination; the supportability of the opinion; the consistency of the opinion; and whether the treating source is a specialist. See 20 C.F.R. § 404.1527(c)(1)-(6). These factors are also to be considered with regard to non-treating acceptable medical sources, such as consultative physicians and psychiatrists. See 20 C.F.R. § 404.1527(a)(1), (c), (e); 20 C.F.R. § 404.1513(a)(1), (2) (eff. until Mar. 26, 2017).

### 2. Dr. Garneau's Opinion

On October 12, 2015, Dr. Garneau completed a Medical Source Statement (T.273-77), indicating that Plaintiff had ongoing issues with RA, migraines, hypothyroidism, and depression. She experienced diffuse joint pain and in, his opinion, pain or other symptoms were severe enough to interfere "constantly" with the attention and concentration needed to perform even simple work tasks. (T.273-74).

-6-

Dr. Garneau opined that Plaintiff could walk two city blocks without rest or severe pain; could sit for 15 minutes at a time and stand for 10 minutes; could stand/walk less than 2 hours of an 8-hour workday; could sit for 4 hours up to 45 minutes at a time; and could frequently lift less than 10 pounds. (T.274-75). She "cannot stand" and could never twist, stoop, crouch/squat, or climb. She had "good days" and "bad days" and would miss work more than four days of work per month due to her impairments. (T.276).

With regard to Dr. Garneau, the ALJ found that the "extreme findings and limitations" he assigned to Plaintiff based on her RA symptoms should be "given little weight, "as they are inconsistent internally with the doctor's own treatment notes and with the overall record evidence." (T.26). With regard to whether Dr. Garneau's opinion is inconsistent with his own treatment notes, the ALJ noted that Plaintiff testified at the hearing that she had seen Dr. Garneau "a couple of times" for acute conditions such as colds. The ALJ inferred from this that Dr. Garneau's opinions about Plaintiff's limitations "appear[ed] to be based on the claimant's self-reports[.]" (T.26). While Dr. Garneau did receive copies of the reports from Plaintiff's neurologist and rheumatologist, since he was her primary care physician, (Tr. 279-89), there appears to be only one treatment note from him dated October 7, 2015, when Plaintiff requested that he fill out disability paperwork. Dr. Garneau stated that Plaintiff's pain or other symptoms were

severe enough to interfere constantly with attention and concentration needed to perform even simple work tasks. (T.274). However, his treatment notes show that Plaintiff denied having any memory loss or difficulty concentrating. (T.320). He assigned extreme limitations in lifting, walking, sitting, and standing, but his physical examination of her neck, chest, abdomen, and extremities were generally within normal limits. (T.274, 319-20). While her left knee showed some tenderness, she had full range of motion ("ROM") without deformity. (T.319). Although Plaintiff's ROM in her hands was decreased, she had no swelling, her grip strength was full at 5/5 bilaterally, and she had full 5/5 strength in all extremities (T.319). Her sensation, reflexes, coordination, gait, and monofilament testing were all normal. (T.319). The ALJ's finding that the extreme limitations in Dr. Garneau's medical source statement were inconsistent with his treatment notes (T.26) was supported by substantial evidence. Furthermore, Dr. Garneau's statement that Plaintiff's RA was "disability appropriate" is not entitled to any particular weight. See 20 C.F.R. § 404.1527(e)(1) (an opinion concerning the ultimate issue of disability under the Act is reserved to the Commissioner); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative").

Furthermore, Dr. Garneau's opinion that Plaintiff's RA was "disability appropriate" is not supported by the opinion of her

rheumatologist, Christopher Ritchlin, M.D., who, as a specialist, is well situated to opine as to the limitations from Plaintiff's autoimmune disease. On May 7, 2014, Plaintiff saw Dr. Ritchlin for a follow-up and reported that she was without her RA medication for approximately eight weeks and her arthritis flared; however, when she restarted the medication, her joint pain had improved eight weeks later. (T.217). On examination, Plaintiff was tender over the shoulders and right thumb, but there was no joint swelling, and her knees and feet were not tender or swollen. (T.219). Plaintiff also had no joint tenderness or deformity in her neck, spine, ribs, or pelvis, and had normal active and passive ROM without pain as well as normal muscle tone and strength. Dr. Ritchlin observed that Plaintiff's RA was not particularly active as evidenced by a relatively unremarkable examination. (T.200). He continued Plaintiff's medications and recommended daily exercise and mindfulness meditation. Dr. Ritchlin opined that she "certainly did not need disability from an RA standpoint." (T.200). Dr. Ritchlin's examination findings were similar in August 2014, and despite complaints of arthralgias in multiple joints, her acute phase reactants were not elevated. (T.291). Plaintiff switched to a new rheumatologist in August 2014, Dr. Keith Pryhuber, who noted "subtle changes" and thought she should stay on the Enbrel and that she may continue to improve based the change in where she was injecting the medication. (T.300). On examination, Dr. Pryhuber

noted no synovial swelling in the metacarpophalangeal joints ("MTPs"), proximal interphalangeal joints ("PIPs"), or distal interphalangeal joints ("DIPs"), although there was tenderness in the PIPs. (T.300). She had good strength in her hands and hip flexors, and no tenderness around the lower lumbar area spine, greater trochanter, or sacroiliac joint. By September 2014, Dr. Pryhuber assessed Plaintiff's inflammation as controlled for the most part. (T.301). Two months later, in December 2014, Dr. Pryhuber's examination showed that Plaintiff had good strength in her hands and her musculoskeletal exam showed tenderness and mild bony prominence at the acromioclavicular joint, but there was no swelling. (T.294). At a follow-up in March 2015, Plaintiff reported that she has been better on the methotrexate and with the weekly vitamin D, but she still has pain in the first MTPs, wrists, and occasionally in the right shoulder. However, On examination, Dr. Pryhuber noted slight decreased grip strength in the hands and deltoids and slight decreased strength in the hip flexors but no difficulty with standing on her toes and her gait was normal. She had trace swelling in both ankles but no synovial swelling in the MTPs, knees, wrists, MCPs, and PIPS, with good ROM in the right shoulder. Dr. Pryhuber indicated that, with regard to her RA, the "inflammation is well controlled but she still has some pain in the MTPs most consistent with osteoarthritis[,]" not rhematoid arthritis. (T.306). In addition, Dr. Pryhuber thought that "it

would be unusual for the rheumatoid arthritis to flare up solely in the right shoulder[;]" rather, "[t]he sudden onset is suggestive of crystal related arthritis[,]" i.e., osteoarthritis. (T.306). Likewise, Dr. Pryhuber thought that the tenderness in the MTPs was osteoarthritis, not RA. With regard to Plaintiff's "slight decreased strength in the proximal muscles and the grip strength[,]" Dr. Pryhuber noted that it was unlikely due to the Plaquenil (which she took for her RA) because, although that medication can cause weakness, it is usually accompanied by loss of reflexes, and Plaintiff's deep tendon reflexes were good. Dr. Pryhuber suspected that, in light of her constellation of symptoms (abdominal bloating, sugar craving, fatigue, forgetfulness), she might have a yeast overgrowth in her intestine which was causing the weakness, or at least a subjective feeling of weakness. Accordingly, Dr. Pryhuber recommended dietary changes. In June 2015, she was "doing okay" with "only occasional minor discomfort in the wrists and shoulders." (T.304). Her "energy was better[;]" there was a "significant improvement" with the "intervention for yeast." (T.304). Her musculoskeletal examination was unremarkable.

### 3. Dr. Dunn's Opinion

On January 22, 2016, Plaintiff saw her neurologist, Dr. Dunn, and requested that he fill out paperwork for her disability application. (T.401). Dr. Dunn stated he reviewed and filled out

the headache questionnaire with Plaintiff. (Id.). Dr. Dunn asserted that given the combination of her medical problems, she was "for all practical purposes completely disabled[.]" (Id.). Plaintiff thought her medication helped moderately with her headaches, and she did not have any side effects. On examination, Dr. Dunn not find any focal neurologic signs and her cardiac examination was benign. She was not return to see him in the summer (approximately 6 months). The headache questionnaire that Dr. Dunn completed with Plaintiff's input indicates that Plaintiff would be absent from work more than four days a month due to headaches. (T.398). In activities requiring sustained persistence and pace and sustained concentration, Dr. Dunn opined that her limitations were mild in thirteen areas, with only one area of moderate limitation. (T.398-99). Dr. Dunn indicated that Plaintiff would need to take unscheduled breaks during an 8-hour workday, but did not indicate how often those breaks would occur. (T.397-98).

With regard to Dr. Dunn, the ALJ found that "his opinions and statements are not well-supported, and are given limited weight. . . ." The ALJ noted that Plaintiff's RA was controlled with medication and was not within the purview of treatment by Dr. Dunn and, moreover, he found that her headache symptoms caused only mild limitations in mental functioning, with one area of moderate limitation. The ALJ further observed that Dr. Dunn's treatment notes were negative for focal neurological signs; her cardiac exam

was benign; she experienced no medication side-effects; and did not have to return until the summer. The ALJ concluded that "[s]uch information indicates that the claimant's headaches and symptoms were medically managed and would not preclude working." The ALJ's observations are consistent with the record. For instance, at a neurological exam in May 2014, Dr. Dunn's findings were benign. (T.215). The ALJ stated that "the overall record indicates treatment for headaches with Propranolol was effective." Although it caused "sluggishness," according to Dr. Dunn, that medication did help "modestly" and abortive treatment with Imitrex was "reasonably effective." By August 2014, despite Plaintiff's failure to take her medications as prescribed, her headaches were "adequately controlled" and she was "doing pretty well." (T.279). When Plaintiff followed up six months later with Dr. Dunn, he indicated that Plaintiff could have an element of benign positional vertigo that might be affecting her migraine disorder. (T.280). Dr. Dunn decided to reduce her Propranolol to address her sluggishness and started her on tizanidine; at her next appointment in June 2015, he noted that tizanidine was helping "modestly" and he planned to increase the dosage. And, her vertigo had cleared. While Dr. Dunn made a statement at a May 2014 appointment that due to her migraines and RA, it seemed "quite impractical for her to be employed," only a few days later Plaintiff's treating rheumatologist Dr. Christopher Ritchlin stated Plaintiff did not

need disability from an RA standpoint. (T.200, 215). The ALJ noted that Plaintiff also misinformed Dr. Dunn when she claimed to him that she had to leave her job; this was not accurate as she continued to work part-time as an administrative assistant at a law firm. (T.22, 280). In January 2016, when he completed the headache questionnaire, Dr. Dunn observed that Plaintiff's exam remained non-focal. (T.26, 282, 401). At that time, she was back on 80 mg of Propranolol twice a day, which she said had "helped moderately" and had "not given her any side effects." (T.401). Dr. Dunn's statements that it seemed "quite impractical for her to be employed" and that Plaintiff was "for all practical purposes completely disabled" are also properly discounted as opinions on the ultimate issue reserved to the Commissioner. <u>See</u> 20 C.F.R. § 404.1527(e)(1) (an opinion concerning the ultimate issue of disability under the Act is reserved to the Commissioner); <u>see also</u> <u>Snell</u>, 177 F.3d at 133 ("A treating physician's statement that the claimant is disabled cannot itself be determinative").

In sum, the Court finds that the ALJ did not misapply the treating physician rule in weighing the medical source statements of Dr. Dunn and Dr. Garneau. The ALJ considered the appropriate factors under the Regulations, and the reasons given for discounting the opinions of Drs. Dunn and Garneau are supported by substantial evidence and are not based on a mischaracterization or misquoting of the record. "Where the Commissioner's decision rests

on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

**B. Failure to Pose Complete Hypotheticals to the VE (Plaintiff's Point I)**

Also under the heading for Point I, Plaintiff argues that the hypotheticals posed to the VE at the hearing and in interrogatories were "poorly crafted" because they "did not reflect or incorporate" Plaintiff's testimony "or any of the limitations in the medical source statement by [her] PCP John Garneau . . . ." (Plaintiff's Brief (Dkt #7-1) at 8). Plaintiff contends that had any of the ALJ's hypotheticals reflected Dr. Garneau's limitations there would have been no substantial gainful activity that Plaintiff could perform. (Id.). However, as discussed in the preceding section, the Court has found that the ALJ did not commit legal error in her weighing of the opinions offered by treating sources Drs. Garneau and Dunn. And, as discussed in the subsequent section of this Decision and Order, the ALJ did not commit legal error in weighing the credibility of Plaintiff's subjective complaints.

Plaintiff also challenges the VE's response to the interrogatories because her past relevant work as an assistant branch/office manager required more than frequent use of the hands (see Pl's Br. at 7), while the ALJ's RFC limited Plaintiff to frequent reaching, handling, fingering/feeling, and pushing/pulling

-15-

(id.). As the Commissioner contends, this conclusory argument is not based on any contrary vocational testimony or other evidence, and is without merit. Furthermore, as the Commissioner points out, the ALJ relied on a number of other jobs, including unskilled light occupations, to find that there was substantial gainful work that Plaintiff could perform other than her past relevant work.

### C. Erroneous Credibility Assessment (Plaintiff's Point II)

The Commissioner's regulations set forth a two-step process for evaluating symptoms such as pain, fatigue, weakness, depression, and nervousness. See 20 C.F.R. §§ 404.1529(c), 416.929(c). First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms; if so, the ALJ "must then evaluate the intensity and persistence of [the claimant's] symptoms" to determine the extent to which the symptoms limit the claimant's capacity for work. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). "[I]f a claimant's statements about his or her symptoms are not substantiated by the objective medical evidence, the ALJ must consider the other evidence and make a finding on the credibility of the individual's statements." Cichocki v. Astrue, 534 F. App'x 71, 76 (2d Cir. 2013) (unpublished opn.) (citing SSR 96-7p, 1996 WL 374186, at *4 (S.S.A. July 2, 1996)). Ultimately, "[i]t is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the

credibility of witnesses, including the claimant." <u>Carroll v. Sec'y of Health & Human Servs.</u>, 705 F.2d 638, 642 (2d Cir. 1983).

Here, the ALJ determined that Plaintiff had "less than full credibility." (T.28). However, the ALJ did not consider any improper factors in making the credibility determination. A conservative pattern of treatment is an appropriate factor to consider in assessing the credibility of a claimant's subjective complaints. <u>See</u>, <u>e.g.</u>, <u>Rivera v. Colvin</u>, No. 1:14-CV-00816 MAT, 2015 WL 6142860, at *6 (W.D.N.Y. Oct. 19, 2015) ("[T]he ALJ was entitled to consider evidence that [the claimant] pursued a conservative treatment as one factor in determining credibility[.]")(citation omitted); Amoroso v. Colvin, No. 13-CV-5115 SJF, 2015 WL 5794226, at *10 (E.D.N.Y. Sept. 30, 2015) (ALJ "properly considered [claimant's] daily activities, such as knitting, sewing, and watching television, 20 C.F.R. § 404.1529(c)(3)(i), and her 'conservative' treatment, 20 C.F.R. § 404.1529(c)(3) (iii), which both suggest that she is capable of performing sedentary work"); <u>Shaffer v. Colvin</u>, No. 1:14-CV-00745, 2015 WL 9307349, at *5 (W.D.N.Y. Dec. 21, 2015) (ALJ properly discredited the claimant's allegations because her treatment was routine and conservative, consisting of medication management and physical therapy).

Plaintiff emphasizes that she has had "numerous complaints of headaches, RA pain and other symptoms by [her]" as of her alleged

onset date. (Pl.'s Br. at 13-14). The ALJ agreed that RA that could wax and wane with periods of exacerbation, but was entitled to find that her complaints of pain were not so severe as to result in limitations precluding all gainful employment. The ALJ properly noted that although Plaintiff complained of pain, her RA flared when she was off medications but generally improved when she took her medications. Precipitating and aggravating factors, and the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain are proper factors under 20 C.F.R. § 404.1529(c).[4]

The ALJ also found that Plaintiff's extensive daily activities failed to indicate disabling limitations. (T.24-25). A claimant's daily activities are a proper consideration by the ALJ in assessing his or her subjective complaints. In her Function Report, Plaintiff stated that her husband traveled for work, so she was the primary caregiver for their young daughter. In addition to performing the bulk of the childcare activities, including getting her daughter ready for school or daycare, Plaintiff also took her daughter to Brownies meetings, occasional field trips, and playdates with other children. (T.25, 48, 161-62). In addition, Plaintiff performed all house maintenance chores while her husband was away and prepared fresh-cooked meals daily; could do cleaning, laundry, and ironing

---

[4]
    Plaintiff attended a physical therapy assessment, but then failed to schedule any appointments and was discharged from care. (T.227-28).

but would break it up over a few days or ask her husband for help. (T.158-60). Plaintiff also ran errands and shopped for groceries. (T.25, 45). At the consultative examination, Plaintiff listed, as her daily activities, looking for jobs, taking care of her daughter and doing housework. (T.268). At the hearing Plaintiff testified that, when she lost her job, she started selling items on Craigslist, eBay, and at a consignment shop, and eventually went back to work part-time (20 hours a week) in October 2014 as an administrative assistant in a law firm. (T.24-25, 42). Substantial evidence supports the ALJ's finding that Plaintiff's daily activities were inconsistent with her subjective complaints of disabling pain. See, e.g., Poupore v. Astrue, 566 F.3d 303, 307 (2d Cir. 2009) ("[T]he ALJ correctly noted that Poupore was able to care for his one-year-old child, including changing diapers, that he sometimes vacuumed and washed dishes, that he occasionally drove, and that he watched television, read, and used the computer. Given all the evidence before him, the ALJ properly found that Poupore's testimony about his limitations was not fully credible.").

Plaintiff faults the ALJ for not finding her more credible in light of what the ALJ acknowledged was a significant work history. (T.23). Although "a good work history may be deemed probative of credibility . . . it bears emphasizing that work history is just one of many factors that the ALJ is instructed to consider in

-19-

weighing the credibility of claimant testimony." Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998). There were, however, other factors related to Plaintiff's employment history that the ALJ found detracted from her credibility. For example, the ALJ properly noted that it appeared Plaintiff was terminated from her job for reasons not related to her medical condition. (T.23, 217, 266). Plaintiff told Dr. Ritchlin and that she lost her job due to a hostile work environment. (T.217). At her consultative examination, Plaintiff told the psychologist that she was terminated from her job because of harassment from another employee. (T.266). However, Dr. Dunn, who provided one of the treating source opinions at issue, was under the impression that "lost her job because of the difficulty with rheumatoid arthritis." The ALJ noted that Plaintiff "was not forthcoming regarding reasons she lost her job, which does not appear to correlate with a medically determinable impairment." (T.26 (citing Ex. 2F/1; 4F; 7F/3)). Inconsistencies in a claimant's statements in connection with a disability application are properly considered in assessing his or her credibility. See Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) (unpublished opn.) ("[O]ther factors—in particular, the inconsistency between Campbell's testimony and his medical records—weighed against a positive credibility finding as to Campbell's subjective assessment of the intensity of his symptoms. The ALJ's decision not to rely exclusively on Campbell's good work history was therefore not

erroneous.") (citing <u>Wavercak v. Astrue</u>, 420 F. App'x 91, 94 (2d Cir. 2011) (unpublished opn.)). In addition, the ALJ also observed that Plaintiff started working part-time a year after prior employment ended. (T.28). A claimant's work during the relevant period, even on a part-time or less than substantial-gainful-employment basis, may be considered in assessing his or her functional limitations. <u>See</u> <u>Rivers v. Astrue</u>, 280 F. App'x 20, 23 (2d Cir. 2008) (unpublished opn.) (noting that while claimant's work during the relevant period did not meet the threshold for substantial gainful activity, that he worked at levels consistent with light work).

The ALJ did consider the statements Plaintiff submitted from her current employer (the law firm at which she was working 20 hours per week) indicating that Plaintiff "has called in sick and been tardy an unusual number of days, far more than what an average employee would. We have had to make exceptions to accommodate her, and have been flexible far beyond the norm recognizing she has been dealing with health issues." (T.28 (citation to record omitted)). The ALJ stated it was unclear what accommodations were made for Plaintiff at her current job, and relied on the observation by medical expert Dr. Winkler, whose opinion she assigned great weight, that it was unclear why Plaintiff was missing so much work. (T.28). As the Second Circuit has made clear, when reviewing a decision of the Commissioner

denying a claim for benefits, "whether there is substantial evidence supporting the [claimant's] view is not the question . . .; rather, [the Court] must decide whether substantial evidence supports *the ALJ's decision*." Bonet ex rel. T.B. v. Colvin, 523 F. App'x 58, 59 (2d Cir. 2013) (unpublished opn.) (emphasis in original). Thus, even though there might substantial evidence in the record weighing against the Commissioner's factual findings, the Commissioner's determination will not be disturbed so long as substantial evidence also supports it. See DeChirico v. Callahan, 134 F.3d 1177, 1182 (2d Cir. 1998) (upholding the Commissioner's decision where there was substantial evidence for both sides). Here, the ALJ's credibility assessment was supported by substantial evidence in the record. Therefore, the Court cannot find a basis for disturbing it.

## V.   Conclusion

For the foregoing reasons, the Court finds that the Commissioner's decision is free of legal error and is supported by substantial evidence. Therefore, it is affirmed. Plaintiff's motion for judgment on the pleadings is denied and the Commissioner's motion for judgment on the pleadings is granted. The Clerk of Court is directed to close this case.

**SO ORDERED.**

S/Michael A. Telesca

_____

HON. MICHAEL A. TELESCA
United States District Judge

Dated:     April 26, 2018
           Rochester, New York.

-22-